IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Robert Gibson, | : | |
| Plaintiff | : | Civil Action 2:08-cv-1114 |
| v. | : | Judge Holschuh |
| Stanley Taylor, *et al.*, | : | Magistrate Judge Abel |
| Defendants. | : | |

**REPORT AND RECOMMENDATION**

This matter is before the Magistrate Judge for a report and recommendation on Defendants' motion for summary judgment (Doc. 22).  For the reasons set forth herein, I recommend that the motion be granted.

<u>Factual background</u>.  The following facts are taken from the complaint. Plaintiff Robert Gibson was, at all relevant times, incarcerated in the London Correctional Institution ("LoCI").  He was admitted to the Ohio penal system on or about November 30, 2007, and transferred to LoCI on or about December 11, 2007. Upon his arrival at LoCI, doctors there gave him a one-year medical bottom bunk restriction, due to a seizure disorder from which Plaintiff suffered.  However, on or about January 20, 2008, the current shift captain, Defendant Stanley Taylor ("Taylor"), placed Plaintiff in SMH (administrative segregation) due to a rule infraction.  Upon arrival there, Plaintiff was obliged to take the top bunk in his new cell.  On or about January 24, 2008, Plaintiff suffered a seizure while asleep.  He

1

fell to the ground of his cell, and suffered a fractured vertebra.

The complaint further alleges that upon his arrival in SMH, Gibson immediately informed the escorting officer, whom he has named in his complaint as a "John Doe", that he had a bottom bunk restriction. Doe allegedly informed Plaintiff that Taylor had assigned him to a specific top bunk. Gibson complained to other correctional officers that he required a bottom bunk, but that no actions were taken. He attempted to put his mattress on the floor to sleep instead, but was told by Doe that it was not permitted and that he would be restrained if he did not replace his mattress on the top bunk and sleep there.

In his complaint, Plaintiff pled claims under 42 U.S.C. §1983 against Taylor, Deb Timmerman-Cooper ("Cooper"), the warden of LoCI, and Doe, alleging that they were deliberately indifferent to his legitimate medical needs, in violation of his rights under the Eighth Amendment to the United States Constitution. He alleges specifically that Defendants had a custom and policy of intentionally ignoring bottom bunk restrictions. He also brought a claim for negligence under Ohio common law.[1] Defendants have moved for summary judgment on all these claims.

**Summary judgment**. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

---

[1] Defendants argue that Plaintiff's claim for negligence against them arising under Ohio common law is barred because, as such a claim must be brought first in the Ohio Court of Claims, this court lacks subject matter jurisdiction over it. Plaintiff, in his memorandum contra, conceded that these claims should be dismissed without prejudice. (Doc. 33 at 10.)

no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [...] but [...] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324.  Furthermore, the

3

existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

**Exhaustion of administrative remedies**. Defendant argues that Plaintiff failed to exhaust his administrative remedies with respect to Cooper, a necessary predicate for a prisoner to bring suit regarding conditions of confinement under the Prison Litigation Reform Act, 42 U.S.C. §1997e(a). *See Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998). Administrative remedies are exhausted, instead of merely pursued, where an inmate has filed a complaint and pursued it "to the highest possible administrative level." *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003). Here, Defendants argue, the grievance documents at issue in this case make it clear that Plaintiff never complained of any act or omission on the part of Cooper. Plaintiff rejoins that he attempted to exhaust his administrative remedies, but was frustrated by the Chief Inspector's refusal to tell him the names of the persons responsible for his bunk assignment.

Plaintiff's February 19, 2008 notification of grievance sought:

All of my issues can be resolved if you just answer my question.
1. Why was I placed on a top bunk, on 1-20-2008, when I went to the hole?

2. When is my bottom bunk restriction up?

(Doc. 33-1 at 1.) It made no explicit reference to Cooper. The institutional

inspector's March 19, 2008 response stated that Plaintiff's bottom bunk restriction was for one year, but that Plaintiff should have complained about the incorrect bunk placement when he first learned of it. "[T]here is nothing that can be done about it after the fact." (*Id.* at 2.) In a subsequent appeal to the chief inspector, Plaintiff protested that the institutional inspector had not answered his questions, because:

> I wanted to know who put me on the top bunk, and why I was placed on a top bunk, when I had a documented medical bottom bunk restriction. I need this question answered, because I want to write that person up for disregarding my medical restrictions. Please answer my questions. All I want to know is who was the officer that put me on the top bunk, when I was placed in the hole, SMH, on 1-20-2008. Was it the shift captain Taylor? Who was it?

(*Id.* at 3.) The chief inspector responded:

> The name of the officer who put you on a top bunk when you went to "the hole" won't be of consequence to you. The officer follows instructions from his supervisor. Unless security has the written documentation that an inmate has a bottom bunk, he places an inmate where he deems necessary. Medical should have been contacted by you when this happened.

(*Id.* at 4.)

Plaintiff has a colorable argument that the institutional inspector and chief inspector frustrated his efforts to identify the John Doe officer who actually placed him in his segregation cell.² However, his apparent assertion that these

---

² Plaintiff identified "John Doe" in his complaint as a correctional officer at LoCI, whose last name "may be 'McCoy'" (Doc. 3 at 5), and reiterated at deposition that "Officer McCoy" told him that Taylor had made the decision to assign him to a top bunk. (Doc. 25-1 at 35.) Defendants' motion for summary judgment was accompanied by a declaration under penalty of perjury by corrections officer Mark

5

communications frustrated his ability to identify the warden of his prison is meritless.  Plaintiff's attempts in his grievances to learn the name of "the officer that put me on the top bunk" cannot plausibly be taken as an attempt to exhaust, or even pursue, administrative remedies against the warden, especially where he at no time made any suggestion that she might have been responsible for what happened.[3]  Plaintiff has brought suit against Cooper without first exhausting his administrative remedies, and without having been frustrated in an effort to discover her identity.  Accordingly, summary judgment would properly be granted to Cooper on her affirmative defense of failure to exhaust administrative remedies.

      **Eighth Amendment claim against Taylor**.  Under some circumstances, refusal to attend to the medical needs of prisoners can be violative of constitutional rights.  In *Estelle v. Gamble*, 429 U.S. 97, the United States Supreme Court held that the Eighth Amendment requires the government to "provide medical care for

---

McCoy, who stated that he recalled Gibson and had worked in the segregation area during the time in question.  (Doc. 22-1.)  However, Plaintiff has never amended his complaint to identify "John Doe" specifically, or served that individual.

    [3] Although he did not refer to the incident in his complaint, Plaintiff asserted at deposition that, at one point, "[t]he warden came by and I brought [the need for a bottom bunk] to her attention, said she would take care of it." (Doc. 25-1 at 17.) That testimony is wholly inconsistent with the repeated assertions in Gibson's grievances that he did not know who placed him in a top bunk or who was responsible for his remaining in the top bunk.  Defendants offer prison logs which, they state, prove that Plaintiff's testimony is factually impossible, as Cooper was never in the segregation area at the same time as Plaintiff.  Moreover, Plaintiff also testified at deposition was that the reason he had named Cooper as a defendant was "she runs the prison, so, you know, I thought it would fall back on her." (*Id.* at 34.) In any case, Plaintiff neither made reference to Cooper in any of the grievance records in evidence, nor provided any evidence in this action of any attempt to file a grievance against Cooper for failing to address his bunk requirement.

those whom it is punishing by incarceration". *Id.* at 103. It further noted that:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104.

However, the failure to attend to a serious medical need only rises to the level of deprivation of civil rights where both an objective and a subjective requirement have been met. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). A plaintiff must objectively show the existence of a "sufficiently serious" medical need. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). Furthermore, he must satisfy the subjective requirement by showing that prison officials acted with "deliberate indifference" to the serious medical need. An official does so where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference is more than "'mere negligence'". *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008), quoting *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 544 (6th Cir. 2003). *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008).

The parties here do not dispute that Plaintiff's need for a bottom bunk due to the substantial risk of harm from a fall was an objectively serious medical need.

The question at hand is whether Taylor acted with deliberate indifference to this need.  At deposition, he testified that whenever an inmate was moved to SMH (segregation), the shift supervisor called and notified medical staff of the move, regardless of the prisoner's apparent health status.  (Doc. 23-1 at 41.)  This was typically a one-way communication, and SMH personnel generally became aware of newly arrived inmates' medical restrictions when the inmates themselves reported them.  (*Id.* at 38.)  Medical services would also call SMH to advise of special requirements for an inmate.  (*Id.* at 45.)  With respect to bunk assignments, Taylor testified that it was not the usual policy for supervisory staff or corrections officers to make specific assignments of top or bottom bunk in the absence of a known medical restriction;  the matter was left up to the inmates themselves.  (*Id.* at 45-46.)  Taylor testified that he had not been aware of Gibson's bottom bunk restriction in January 2008, and that neither Gibson, nor other corrections officers, nor medical services had informed him of it.  However, if he had been made aware Taylor would have given instructions to have Gibson moved.  (*Id.* at 64-65.)

> Gibson sets forth his argument against Taylor thus:
>
> The evidence here again supports either one of two paths to liability against Taylor.  First, a jury could infer that Taylor was, in fact, aware of Gibson's bottom bunk restriction.  Taylor's own testimony confirms that, as shift captain, he would have been notified – as a matter of course – about any medical restriction for Gibson.  Given this knowledge, Taylor was required to act to protect Gibson from the harm that could befall him from sleeping on a top bunk.  Second, even if a jury agrees that Taylor was not informed specifically of Gibson's restriction, it could conclude that Taylor had a duty to call inmate health services to learn of any medical restrictions.  A reasonable jury could conclude that Taylor's years of experience put him on notice as to the risks of housing inmates with no knowledge of their potential

8

>   medical conditions.  Thus, either Taylor knew of Gibson's bottom-bunk restriction, in which case he displayed deliberate indifference in celling him with another bottom-bunk restricted inmate, or else he had no information about his medical conditions, in which [sic] he displayed deliberate indifference by failing to find out.

(Doc. 33 at 7-8.)  The first of these two contentions – that Taylor would have been notified "as a matter of course" about Gibson's restriction – is unsupported by the evidence of record.  As noted above, Taylor testified that there was no systematic means by which the transfer of an inmate to SMH was accompanied by notice of medical restrictions:

>   Q. Let's do this.  John Smith is transferred into S.M.H.
>   A. Okay.
>   Q. The shift captain makes the call over to medical and says, "John Smith being transferred into S.M.H."
>   A. Okay.
>   Q. It turns out that John Smith has two or three different medical restrictions.  He needs a cane, he needs a CPAP, he needs a bottom bunk.
>   A. Okay.
>   Q. At some point is medical going to tell someone in S.M.H. or a shift captain in some way – and I don't know which way – that those restrictions exist?
>   A. I am sure, yeah.  I am sure medical would, yes.  It has in the past, yes.
>   Q. How does that information get transmitted?  When you were shift captain, how would you find out about those things from medical?
>   A. Well, either when I am making rounds in [Inmate Health Services] or they would call me on the phone or by the radio and say, "This inmate needs this and needs these special requirements in S.M.H."

(Doc. 23-1 at 44-45.)  Even with all reasonable inferences drawn in Plaintiff's favor, Taylor's testimony does not support a conclusion that *he* would have been notified as a matter of course about Gibson's bunk restriction.  Taylor expressed his confidence that medical services would notify "someone" at SMH "in some way" of a

transferred inmate's medical restrictions, because "[i]t has in the past".[4] Moreover, he testified earlier about how SMH typically became aware of medical restrictions:

> Q. Okay. When an inmate transfers from general population to the special management housing unit, how does the S.M.H. supervisors – how do the S.M.H. supervisors become aware of medical restrictions impacting a particular inmate?
> A. In general, basically, it is the verbal communication of the inmate himself.
> [...]
> Q. [...] Just have an inmate with a bottom bunk restriction. You would expect that an inmate would tell either a CO or the S.M.H. lieutenant, "I have got a bottom bunk restriction"?
> A. Right. Or even a supervisor that makes rounds.

(*Id.* at 38-39.)

Plaintiff compares the case at bar to *Cooper v. County of Washtenaw*, 222 Fed.Appx. 459 (6th Cir. 2007). In *Cooper*, a prisoner declared at his arraignment that he wanted to kill himself and had to be physically restrained and removed from the courtroom. The judge ordered him placed on suicide watch, and the prisoner was transported to the county jail to await sentencing. He was placed in a glass-walled observation cell and given a special anti-suicide gown to wear. However, the prisoner was later changed into a different outfit and left unsupervised in a holding cell, whereupon he hanged himself. The prisoner's personal representative brought suit, claiming that police had been deliberately indifferent to the prisoner's known risk of suicidal behavior.

---

[4] Taylor explicitly testified that, when S.M.H. informed medical services of a new prisoner, medical services took a log entry of the call, but did not then supply any information back to S.M.H. "The call is made to give information. It is not a two-way." (Doc. 23-1 at 43.)

10

On appeal, the court found that summary judgment could not be granted to the police defendants on this claim.  Plaintiff refers to one defendant in particular, a police officer who testified that it was customary for him to receive a copy of court orders, and that it was likely that if he had received it then he would have read it.  The Court of Appeals found that circumstantial evidence permitted an inference that the officer was aware of the risk.  However, the *Cooper* court based this finding not merely on the officer's testimony that he probably would have read the court order, but also on testimony by another officer that the defendant had actually been orally informed of the suicide watch, as well as the defendant's ability to perceive for himself that the prisoner was dressed in a special suicide-proof gown and being held in an observational cell.  *Id.* at 468-69.

*Cooper* illustrates, by contrast, the lack of evidence here from which a reasonable finder of fact could infer that Taylor was aware of Gibson's bunk restriction.  Taylor testified only that he was sure that medical services would, at some point, inform someone at S.M.H. concerning a new prisoner's medical restrictions, but that more typically supervisory personnel became aware of these restrictions because the prisoners themselves informed the officers on duty.  It is too far a leap to reasonably find, beyond the realm of mere supposition, both that Taylor personally must have been aware of facts from which the inference could have been drawn that Gibson had been endangered by placement in a cell without respect to his bunk restriction, and that Taylor actually drew that inference.  *Farmer*, 511 U.S. at 838.  Plaintiff has presented no evidence that would permit a

reasonable finder of fact to find in Taylor a reckless disregard of a substantial risk of serious harm to Gibson. *Id.* at 836.

Plaintiff's second contention – that a jury could conclude that Taylor had a duty to call inmate health services to learn of any medical restrictions – runs afoul of the requirement that a defendant is deliberately indifferent only where he disregards a *known* risk.  Plaintiff argues that Taylor could have displayed deliberate indifference by "failing to find out" about any potential conditions Gibson may have had, because his experience would have led him to know of the risks of housing inmates with no knowledge of their potential medical conditions.  However, deliberate indifference exists where an official recklessly disregarded the import of facts within his knowledge.  A prison official is not charged, under the Eighth Amendment, with researching whether a given prisoner might have a medical restriction, simply because sometimes other prisoners did.  A reasonable jury could not draw this conclusion, especially where Plaintiff has adduced no evidence that Taylor, if he had not actually known of any medical restriction affecting Gibson, had any reason to suppose there might be one.

**Conclusions**.  As stated above, Plaintiff failed to exhaust his administrative remedies with respect to Defendant Deb Timmerman-Cooper before filing suit against her.  Furthermore, no genuine issue of material fact exists as to whether Defendant Stanley Taylor was deliberately indifferent to a substantial risk of serious harm to Plaintiff.  Accordingly, I **RECOMMEND** that Defendants' motion for summary judgment (Doc. 22) be **GRANTED**.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).

s/Mark R. Abel<br>
United States Magistrate Judge